# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3888-17T4

ELWIRA LEWANDOWSKI,

    Plaintiff- Respondent,

v.

MIROSLAW LEWANDOWSKI,

    Defendant-Appellant.

_____

        Submitted November 19, 2019 - Decided September 4, 2020

        Before Judges Accurso and Rose.

        On appeal from the Superior Court of New Jersey,
        Chancery Division, Family Part, Sussex County,
        Docket No. FM-19-0427-15.

        Miroslaw Lewandowski, appellant pro se (Mariann C.
        Murphy, on the brief).

        Pescatore & Sauter, attorneys for respondent (Amy
        Lynn Sauter, on the brief).

PER CURIAM

Following a twelve-day trial, Judge Franzblau entered a judgment of divorce ending plaintiff Elwira Lewandowski and defendant Miroslaw Lewandowski's nineteen-year marriage and bitter divorce and awarding plaintiff sole legal and physical custody of the parties' three children. Defendant appeals, contending the court erred in that custody decision and by unreasonably restricting his parenting time. He also argues the court erred in denying him the opportunity to obtain an employability evaluation of plaintiff, imputing only minimum wage income to her, omitting the adoption subsidies she receives for the children in calculating his child support obligation, ordering the sale of the marital home, and awarding plaintiff attorneys' fees.

Because the adoption subsidies should have been included as income to plaintiff when calculating defendant's child support obligation, we remand for recalculation of the support obligation. We otherwise affirm, substantially for the reasons expressed in Judge Franzblau's thorough and thoughtful eighty-six-page written opinion.

The facts are meticulously detailed in Judge Franzblau's opinion and we do not repeat them here. We note only that the parties married in Poland in 1997 and emigrated to the United States the following year. Together they became devout Christians, deciding "to live their lives in strict adherence to

A-3888-17T4

their Christian religious beliefs and biblical teachings." Following their marriage, "the parties agreed that they would observe traditional biblical roles, wherein the husband would provide for the family and the wife would serve and submit to her husband." Although plaintiff completed medical school in Poland, she never obtained a license here and has never worked as a doctor. Other than a year spent as a sales clerk at Nordstrom's at the start of their marriage, plaintiff has never worked outside the home. Defendant is an architect with his own business.

When the parties learned they couldn't have children, they became resource parents, fostering several special needs children. They eventually adopted three of those children, two girls and a boy, twelve, nine and eight when the judgment was entered. During the marriage, plaintiff home schooled the children, and defendant moved his office to the parties' home to spend more time with his family. Their marital discord was born over disagreements about living their faith, particularly as it related to raising their children.

Matters came to a head over the issue of corporal punishment. Although both parents were initially committed to physically disciplining their children, "because that was the Bible," plaintiff believed defendant hit the children in anger as they got older and their behavior became more of a challenge. When

3

defendant did not accept plaintiff's entreaties to "not discipline [the] children in anger," and to "be gentle and not hurt them," she decided she would no longer "be a part of this" and refused to spank the children. As she explained at trial, she believed defendant was breaking the promise they made to the children that they would not be disciplined in "anger and harshness." Plaintiff testified she "didn't want them to associate this with God at all because I thought that was misrepresenting God because . . . whatever He does is out of love and kindness and goodness."

Defendant responded by telling the children "that the parent that doesn't spank the child hates the child," and that their mother was "sending them to hell" because she wouldn't discipline them. He had his pastor and a Christian counselor read to them from the bible "that the parent who doesn't discipline, spank the child, hates them." Plaintiff also claimed defendant told the children that she was like Vashti, a biblical woman mocked as a rebellious wife for disobeying her husband. Defendant admitted only that he acknowledged their children's comparing plaintiff to Vashti when he was studying the bible with them. He explained the bible says women should submit to their husbands and Vashti did not and was punished as an example to all of the women in the kingdom. He claimed one of their children, probably their son, asked him if

A-3888-17T4

plaintiff was like Vashti. Defendant admitted the comparison "was negative," but defended himself, saying, "[b]ut they asked me. I couldn't say, no, . . . your mommy is not like Vashti."

The children continued to be a flash point during the pendency of the divorce. The parties continued to clash over the issue of corporal punishment, as well as public school, counseling for the children, and what extra-curricular activities they should participate in. Exacerbating their continued conflict was that the parties were both living in the marital home after plaintiff filed for divorce, with plaintiff in the master bedroom and defendant in the in-law suite where he maintained his office. Orders were eventually entered confining the parties to their own portion of the marital home and forbidding each from interfering in the other's time with the children. The court appointed a joint custody/parenting evaluator and a guardian ad litem for the children, both of whom were recommended by defendant's counsel.

The court eventually granted plaintiff's motions pendente lite to permit the children to participate in certain sports, to allow her to engage the children in non-Christian counseling and to enroll them in public school in order to take advantage of the enhanced services available. Defendant was adamantly opposed to both counseling and enrolling the children in public school because

5

they contravened his religious convictions, notwithstanding that he had once considered sending the children to public school himself in light of the difficulties of home schooling them. As to counseling, the court noted that both the guardian and the parties' joint custody evaluator, as well as the Division of Child Protection and Permanency, had all recommended the children receive counseling. The court determined the children needed professional counseling, and that it was required to "intervene to protect a child where the religious beliefs of the parent threaten the well-being of the child." In addition, it reasoned that the "rights of one parent who opposes counseling on the basis of his religious beliefs should not contravene the rights of the other parent who believes counseling is in the best interest of the child."

All three children, although unrelated, were born to mothers with psychological or substance abuse issues. Their younger daughter was born drug addicted, spending over a month in the hospital at birth being weaned off drugs. She had a great deal of difficulty sometimes regulating her emotions. Described as a sweet and engaging child, she could, without much warning, turn violent and aggressive, injuring her siblings and destroying property. Both parties had difficulty restraining her at such times. Plaintiff claimed defendant viewed the child's "fits" as a challenge to him and his authority and

6

disciplined her harshly. Defendant denied the charge. He sometimes acknowledged that the children had "certain needs," but he averred in a certification that "it is clear that many of their problematic behaviors (disobedience, anger, lying, etc.) developed or increased after filing for divorce, by children observing, learning and repeating hatred, manipulation, unforgiveness, anger, hypocrisy exemplified by the plaintiff toward me, despite my continuous calls for forgiveness and reconciliation."

Although both the custody evaluator and the guardian initially recommended that the parties share legal and physical custody of the children, both changed their recommendations following a concerning medical episode involving the parties' older daughter. The girl, then ten years old, reported experiencing visual and auditory hallucinations. Her birth mother suffered from bipolar disorder. Plaintiff wanted to take the child to a psychiatrist, but defendant refused consent. When the problem persisted, plaintiff took the child to the emergency room. Doctors recommended follow-up with her pediatrician and a neurologist. The child's pediatrician recommended a psychiatric evaluation. The child was evaluated, diagnosed with a psychosis, not otherwise specified and prescribed medication. Defendant refused the

A-3888-17T4

medication and plaintiff moved for emergent sole custody to permit her to address the child's needs.

Judge Franzblau granted the relief, noting defendant's failure to consent to prescribed medication for his daughter pending a second opinion, which he then "failed to obtain for more than five weeks." The judge also took into account defendant's certification in opposition to the motion in which he insisted the behavior of the parties' older daughter was "completely normal for a ten-year-old girl who goes through terrible divorce" and that the child was currently "doing very well, she is energetic, enthusiastic and joyful." The judge, unable "to reconcile defendant's belief that [the ten-year-old] is 'doing very well' and that she is 'enthusiastic and joyful' with [her] recent note that reflects self-loathing and suicidal ideations," found an immediate need to temporarily remove all three children "from the legal and physical custody of the defendant due to serious and imminent safety concerns, including, but not limited to defendant's failure to tend to the acute and daily medical and emotional needs of his children, especially [his older daughter]." The judge continued emergent sole custody in plaintiff pending trial.

At trial, both the guardian and the parties' joint custody evaluator testified that shared custody would not be in the children's best interests

because of their parents' inability to communicate or agree on anything. Both expressed concern about defendant's use of excessive physical discipline and recommended that plaintiff, who was more proactive and attuned to the children's needs, should have sole legal and physical custody. Both also recommended against defendant having overnight parenting time for the foreseeable future. The custody evaluator testified that she believed plaintiff would place the children's best interests "above anything else in her life," whereas defendant "places his religious beliefs before anything and everything else." The guardian noted that defendant did not accept that his older daughter's auditory and visual hallucinations were a sign of mental illness and instead attributed it to the "evil" brought into their home by plaintiff filing for divorce. The parties' joint custody expert opined that defendant's "religious convictions [were] fine for [him]," but could "impact the children in ways that may detract from their well-being." He believed the depth of defendant's religious convictions, "contribute[d] to an inability to reach consensus" on decisions affecting the children.

After hearing the testimony, Judge Franzblau found both the guardian and the parties' joint custody expert credible, rejecting defendant's claims that they were biased against him because of his religious faith. The judge found

defendant offered no proof of religious bias, and that their recommendations were based on the best interests of the children "without regard to defendant's religious practices."

The judge found that plaintiff was "credible in all respects," and that defendant was not credible, for reasons fully explained in his written opinion and documented in defendant's own submissions. Considering the custody factors set forth in N.J.S.A. 9:2-4, the judge concluded it was in the children's best interests to award sole legal and physical custody to plaintiff. The judge was persuaded by "defendant's lack of credibility, the parties' inability to agree on issues regarding the children, defendant's strong desire to institute corporal punishment and . . . defendant's general lack of fitness," including his "deep bitterness and expresse[d] disdain for persons who do not see the world in the same way that he does." The court also refused to award defendant overnight parenting time relying on the recommendations of the guardian and the joint custody expert and its concerns for the children's safety and "their inability to protect themselves." The court qualified that overnight visits could be permitted if plaintiff consented or pursuant to further court order "when the children are old enough to protect themselves."

10

The court found defendant loved his children, that they obviously loved him, and that maintaining a relationship with defendant was in the children's best interests. The judge expressed confidence that plaintiff would work to facilitate the children's relationship with their father in their best interests. It granted parenting time to defendant every Saturday and Sunday from 10:00 a.m. to 7:00 p.m., and on Tuesdays and Thursdays from after school until 7:00 p.m. The court also established a parenting time schedule for holidays, birthdays, and vacation but provided no overnight visitation for defendant.

The court ordered defendant to vacate the marital residence within forty-five days and that the home be listed for sale on May 15, 2019, or sooner at plaintiff's discretion. The net proceeds from the sale were to be divided equally between the parties, with any amounts owed by one party to the other satisfied from the proceeds. The court ordered defendant to pay plaintiff $23,822.67 resulting from the equitable distribution of the parties' other assets.

The court awarded plaintiff alimony of $760 per week for fifteen years. After imputing minimum wage income to plaintiff, it calculated defendant's child support obligation at $271 per week. The court excluded from the child support calculation the adoption subsidies received by plaintiff for the children of $2300 per month.

A-3888-17T4

The court also awarded attorneys' fees of $30,000 to plaintiff. It noted that, according to counsel's certification of services, plaintiff had incurred total fees and costs of $167,772.42. Of that amount, $88,574.47 had been paid by plaintiff and $9596.50 by defendant pursuant to previous court orders, leaving an outstanding balance of $69,601.45.

The court considered the factors in Rule 5:3-5(c), and found that defendant was better able to pay counsel fees due to his remaining assets and earning capacity. Further, because defendant was self-represented during most of the litigation, he did not incur substantial fees and was, therefore, able to contribute to plaintiff's fees. The court found both parties pursued custody of the children in good faith, but defendant's position that plaintiff should not be awarded custody because she abandoned his religious practices was unreasonable. In addition, "material portions" of plaintiff's counsel fees were incurred defending motions brought by defendant that were denied or to compel discovery.

The court found that plaintiff was successful in obtaining custody, alimony, child support, and an equitable distribution. Other factors it considered were defendant's lack of transparency and truthfulness with the court and his conduct during litigation, which the court found "contributed

12

greatly" to its cost. The court found that the fees charged by plaintiff's counsel were reasonable, but because many tasks performed by counsel would have been required regardless of defendant's conduct and because both parties pursued custody of the children in good faith, the court awarded only $30,000 in fees to plaintiff.

We reject defendant's arguments that the court erred in awarding plaintiff sole legal and physical custody and denying him overnight parenting time. We also reject that the court erred in denying defendant the opportunity to obtain an employability evaluation of plaintiff and imputing only minimum wage income to her, in ordering the sale of the marital home, and in awarding plaintiff attorneys' fees.

Because it is important that the parties understand our limited role in reviewing Family Part judgments, we begin by explaining the well-established principles that guide us. We give considerable deference to the discretionary decisions of Family Part judges. Donnelly v. Donnelly, 405 N.J. Super. 117, 127 (App. Div. 2009) (quoting Larbig v. Larbig, 384 N.J. Super. 17, 21 (App. Div. 2006)). When a Family Part judge has made findings of fact after considering the testimony and documents the parties have presented during a non-jury trial, the judge's findings are generally "binding on appeal when

A-3888-17T4

supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1979)).

That is so because of "the family courts' special jurisdiction and expertise in family matters." Id. at 413. Just as important, the trial judge is in the best position to make judgments as to whether witnesses are believable. Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012). For those reasons, we will not reverse a trial judge's findings of fact unless they are "'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Id. at 70 (quoting Rova Farms Resort, Inc., 65 N.J. at 484).

Unlike a trial judge's fact and credibility findings, the judge's "'interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). A trial judge "is in no better position than we are when interpreting a statute or divining the meaning of the law." D.W. v. R.W., 212 N.J. 232, 245 (2012). Thus, we review the legal issues anew. Id. at 245-46.

Applying those standards here, defendant has provided us no basis on which to overturn Judge Franzblau's decision on custody and parenting time. That decision not only has substantial support in the credible evidence in the record, it was recommended by the guardian ad litem and joint custody evaluator defendant urged the court to appoint, as well as the psychiatrist who evaluated both parties and provided a report to the court, whom defendant chose not to cross-examine.

We have considered defendant's claims that his religious beliefs were held against him. Having reviewed the entire record, we find no support for that claim. Because defendant believes that all of his actions toward his children are in keeping with God's direction to him and done for His glory, it logically follows, for him, that any criticism of those actions or conclusion that they are not in the best interests of the children impugns his religious beliefs. But that is not the same thing as objectively demonstrating bias.

There is no question but that disputes over child rearing based on the parents' sincerely held religious beliefs present difficult and delicate issues for family courts required to make decisions about a child's custody and parenting time. In making decisions guided by the child's best interests, our "courts do not choose between religions and entertain no view in that regard. We do no

15

more than seek to establish secular rules to minimize the conflicting pressures placed on the children and permit them to steer a course between the conflicting views and beliefs of their parents." McCown v. McCown, 277 N.J. Super. 213, 219 (App. Div. 1994) (citing Asch v. Asch, 164 N.J. Super. 499, 505 (App. Div.1978)).

Here, of course, the parties are not of different faiths, their disagreements arise out of interpreting the demands of their religious beliefs in the context of the needs of their three children. Plaintiff has remained a member of the same church the family belonged to for many years. That the parties' pastor supported plaintiff's parenting style and values and was critical of defendant's "excessive corporal punishment," terming his rules for the family, "extreme, improper and far from the biblical standard" apparently impelled defendant to leave the family's church. Defendant objected to their older daughter's singing in a Christmas concert there as part of a choir as against his religious beliefs. Our review of the record convinces us that the trial judge asked questions and earnestly tried to understand and be respectful of defendant's religious beliefs and his perspective on events. We detect no hint of bias.

16

Defendant's remaining arguments require only brief comment. The trial judge ordered reports from employability experts to be submitted by January 31, 2016. Defendant did not file his motion seeking to hire a vocational expert until approximately July 2017, long after the expiration of the discovery period and only weeks before the August 7, 2017 trial date. Defendant has not alleged any circumstances beyond his control that prevented him from engaging a vocational expert sooner, nor explained any efforts he undertook to comply with the court's order, or why he didn't timely seek an extension of discovery before the January 31, 2016, deadline. That defendant was representing himself for some period of time, provides him no excuse for noncompliance with court orders and discovery schedules. See Rosenblum v. Borough of Closter, 285 N.J. Super. 230, 24-42 (App. Div. 1995). We find no abuse of discretion. See Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 478 (App. Div. 2012).

The court's decision regarding the amount of income to impute to plaintiff, see Storey v. Storey, 373 N.J. Super. 464, 474-75 (App. Div. 2004), and its decision to order the sale of the marital home, Steneken v. Steneken, 367 N.J. Super. 427, 434-35 (App. Div. 2004), aff'd as modified, 183 N.J. 290 (2005), were both well within the judge's considerable discretion. We likewise

find no error in the court's award of counsel fees, as the court fully explained its reasons for the award in the context of the factors listed in Rule 5:3-5(c), which are supported by the record. See Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008).

Plaintiff concedes that the adoption subsidies should have been included in her income for purposes of calculating defendant's child support obligation. See Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A, www.gannlaw.com (2020) (noting adoption subsidies "are counted as income for the parent who actually receives the benefits (usually the custodial parent))." She argues, however, that another error, the allocation of tax deductions, essentially nets out the amount of the subsidies. We express no opinion on plaintiff's position, and remand for recalculation of child support in accordance with the Guidelines.

In sum, we affirm the judgment, with the exception of the calculation of child support, substantially for the reasons expressed in Judge Franzblau's cogent and comprehensive opinion accompanying the judgment. We remand for recalculation of child support in accordance with the Guidelines, and do not retain jurisdiction.

Affirmed in part and remanded in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3888-17T4